FILED
MAR - 6 2007
MAR. 6, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CHAD OVERLY, | ) |
| Plaintiff, | ) 07CV1265 |
| v. | ) JUDGE DER-YEGHIAYAN |
| CITY OF CHICAGO and JEROME FINNEGAN, | ) MAG. JUDGE NOLAN |
| Defendants. | ) JURY TRIAL DEMANDED |

## COMPLAINT

NOW COMES Plaintiff, CHAD OVERLY, by and through his attorneys, LOEVY & LOEVY, and complaining of Defendants, CITY OF CHICAGO and JEROME FINNEGAN, states as follows:

### Introduction

1. This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

### Jurisdiction and Venue

2. This Court has jurisdiction of the action under 28 U.S.C. §§ 1331 and 1367.

3. Venue is proper as Defendant City of Chicago is a municipal corporation located here and the events giving rise to the claims asserted herein all occurred within this district.

### Background

4. Plaintiff, Chad Overly, lives with his wife and their two children in Bloomington, Illinois.

5. With the exception of the events described below, Mr. Overly has been employed as a truck driver with Brandt Truck Line for approximately the last five years. Mr. Overly's job takes him to and from Chicago on a regular basis.

6. On or about the November 2, 2005, Mr. Overly was driving his truck on Chicago's Adlai Stevenson Expressway when he was cut-off by a car driven by Defendant Finnegan. After cutting him off, Defendant Finnegan forced Mr. Overly to pull his truck off to the side of the road.

7. Once both vehicles were pulled over, Defendant Finnegan approached Mr. Overly, who had stepped down from his truck, and began to attack him. When Mr. Overly attempted to defend himself, Defendant Finnegan displayed his duty weapon to Mr. Overly and informed him that he was a police officer.

8. Mr. Overly immediately stepped away and used his cell phone to call 911. At this time Defendant Finnegan attacked Mr. Overly, pulling him to the ground and forcing him to hang up the phone. Mr. Overly placed a second phone call to 911 before Defendant Finnegan once again forced him to hang up.

9. Defendant Finnegan then held Mr. Overly down while he contacted the Chicago Police Department. During this call, Defendant Finnegan identified himself as a Chicago Police Officer and requested assistance. Throughout this, Defendant Finnegan restrained Mr. Overly, who was not permitted to get up.

10. Thereafter, Chicago Police Officers and an Illinois State Police Trooper arrived at the scene. Based upon Defendant Finnegan's false statements, Mr. Overly was placed under arrest and taken to an Illinois State Police station.

11. During the incident, Defendant Finnegan took possession of Mr. Overly's cell phone, which was never returned.

12. Mr. Overly was eventually charged with battery and reckless conduct. These charges were filed by Defendant Finnegan in his capacity as a police officer.

13. In the following months, Mr. Overly was forced to travel to Chicago to attend multiple court hearings on the charges against him. In January of 2006, after Defendant Finnegan had repeatedly failed to come to court, the charges were dismissed in a manner indicative of Mr. Overly's innocence.

14. As a result of the false charges, Mr. Overly was fired from his job and was able to return to work only after the charges against him were dismissed.

15. At all times during his interactions with Plaintiff, Defendant Finnegan was acting under color of law and within the scope of his employment as a Chicago Police Officer.

### City of Chicago's Failure to Train, Discipline and Control

16. Municipal policy-makers have long been aware of the City of Chicago's policy and practice of failing to properly train, monitor and discipline its police officers:

3

a. Following two high profile, unjustified police shootings in 1999, the City Council held public hearings. On September 28, 1999, then-Superintendent of the Chicago Police Department Terry Hillard gave a speech highlighting the problems with the City of Chicago's policies and practices relating to the use of force. Superintendent Hillard specifically noted the need for (1) better in-service training on the use of force; (2) early detection of potential problem officers; and (3) officer accountability for the use of force.

b. In a review commissioned by the Superintendent, Chicago's John Marshall Law School found that although the City of Chicago's policies on the use of force were in compliance with the law, more training of police officers was necessary.

c. Moreover, in January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

d. A study performed a year later by the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed that resolution. Specifically, the JCGC study concluded that the Chicago Police Department lacked many of the basic tools necessary to identify,

4

monitor, punish and prevent police misconduct and brutality. The JCGC findings were presented to Mayor Daley, Superintendent Hillard and the Chicago Police Board.

   e. Two years later, Garcia v. City of Chicago, 01 C 8954, 2003 WL 22175618 (N.D. Ill. Sept. 19, 2003) affirmed that the City's police misconduct investigations were systematically "incomplete, inconsistent, delayed, and slanted in favor of the officers" and as a result, fostered a culture within the Chicago Police Department where officers felt they could commit misconduct like that described above with impunity.

   f. Indeed, by its own accounting, in 2004, the latest date for which the City of Chicago has provided public statistics, the City sustained only four percent of the complaints brought against police officers for use of excessive force. An even smaller percentage of officers were actually disciplined for such conduct.

  17. Although the City of Chicago has long been aware that its supervision, training and discipline of police officers is entirely inadequate, it has not enacted any measures to address that failure.

  18. In 1996, the City of Chicago intentionally abandoned a program designed to track police officers repeatedly acting in an abusive manner because of opposition by the Police Union. The City promptly deleted all data contained in the program, including the list of problem officers.

5

19. In 2000 and 2001, the City continued to refuse to implement a system allowing for the detection of repeat police officer-offenders, despite the fact that the Commission on Accreditation for Law Enforcement Agencies adopted a standard mandating such a detection system for large agencies such as Chicago.

20. In 2003, although the City of Chicago and the Police Union negotiated a new contract allowing the Chicago Police Department to use unsustained Office of Professional Standards ("OPS") cases "to identify patterns of suspected misconduct about which the public and regulatory agencies are so intensely and legitimately concerned," no such pattern analysis has ever been implemented. Indeed, pursuant to that contract, OPS records are only kept for seven years, precluding any meaningful long-term analysis of an officer's misconduct.

21. Finally, Chicago's training of its officers has not changed since 1999, despite repeated promises by the City and City policymakers for a more comprehensive training program.

### Count I -- 42 U.S.C. § 1983
### Excessive Force

22. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

23. As described in the preceding paragraphs, the conduct of Defendant Finnegan toward Plaintiff constituted excessive force in violation of the United States Constitution.

6

24. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

25. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

26. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in that:

   a. As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

   b. As a matter of both policy and practice, the Chicago Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff; specifically, Chicago Police Officers accused of excessive force can be confident that OPS will not investigate those accusations in earnest and will refuse to recommend discipline even where the Officer has engaged in excessive force;

c. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department abuse citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis, yet the Chicago Police Department makes findings of wrongdoing in a disproportionately small number of cases;

d. Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case; and

e. The City of Chicago has failed to act to remedy the patterns of abuse describe in the preceding sub-paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

27. As a result of the unjustified and excessive use of force by Defendant Finnegan, as well as the City's policy and practice, Plaintiff has suffered pain and injury, as well as emotional distress.

28. The misconduct described in this Count was undertaken by Defendant Finnegan within the scope of his employment and under color of law such that his employer, City of Chicago, is liable for his actions.

## Count II -- 42 U.S.C. § 1983
### False Arrest/Unlawful Detention

29. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

30. As described more fully above, Defendant Finnegan falsely arrested and unlawfully detained Plaintiff without justification and without probable cause.

31. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of others.

32. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described in preceding paragraphs.

33. As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered pain and injury, as well as emotional distress.

34. The misconduct described in this Count was undertaken by Defendant Finnegan within the scope of his employment and under color of law such that his employer, City of Chicago, is liable for his actions.

## COUNT III -- State Law Claim
### Malicious Prosecution

35. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

9

36. In the manner described more fully above, Plaintiff was improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of his innocence.

37. Specifically, Defendant Finnegan accused Plaintiff of criminal activity knowing those accusations to be without probable cause and made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

38. Defendant Finnegan's statements to the prosecutors were made with knowledge that they were false and perjured. In so doing, Defendant Finnegan fabricated evidence and withheld exculpatory information.

39. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

40. As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

### Count IV -- State Law Claim
### Assault and Battery

41. Each of the foregoing Paragraphs is incorporated as if restated fully herein.

42. As described more fully in the preceding paragraphs, the actions of Defendant Finnegan created a reasonable apprehension of imminent harm and constituted offensive physical contact with Plaintiff.

43. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness and reckless indifference to the rights of others.

44. As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

### COUNT V -- State Law Claim
### False Imprisonment

45. Each of the foregoing Paragraphs is incorporated as if restated fully herein.

46. Plaintiff was seized, arrested, and detained by Defendant Finnegan, despite his knowledge that there was no probable cause for doing so.

47. As described in the preceding paragraphs, Defendant Finnegan unlawfully restrained Plaintiff's freedom of movement about by imprisoning him. In this manner, Plaintiff's freedom of movement was unduly and unlawfully restricted.

48. The actions of Defendant Finnegan set forth above were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights.

49. As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

### COUNT VI -- State Law Claim
### Conversion

50. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

51. As described more fully in the preceding paragraphs, Defendant Finnegan stole Plaintiff's cell phone, which was never recovered.

52. Plaintiff has an absolute and unconditional right to this property, which Defendant Finnegan wrongfully and without authorization assumed control, dominion, or ownership of.

53. Plaintiff's demands for return of this property went unheeded.

54. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

55. The misconduct described in this Count was undertaken by Defendant Finnegan within the scope of his employment such that his employer, City of Chicago, is liable for his actions.

### Count VII -- State Law Claim
### Respondeat Superior

56. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

57. In committing the acts alleged in the preceding paragraphs, Defendant Finnegan was a member and agent of the Chicago Police Department, acting at all relevant times within the scope of his employment.

58. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count VIII -- State Law Claim
## Indemnification

59. Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

60. Illinois law provides that public entities must pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

61. Defendant Finnegan is or was an employee of the Chicago Police Department, who acted within the scope of his employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, CHAD OVERLY, respectfully requests that this Court enter judgment in his favor and against the CITY OF CHICAGO and JEROME FINNEGAN, awarding compensatory damages and attorneys' fees, along with punitive damages against JEROME FINNEGAN, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, CHAD OVERLY, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

_____
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Jon Rosenblatt
Gayle Horn
LOEVY & LOEVY
312 North May St
Suite 100
Chicago, IL 60607
(312) 243-5900

14